UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ADAM HAVENS,

                Plaintiff,

- against -

THE HARTFORD FINANCIAL SERVICES GROUP, INC.,

                Defendant.

**ORDER**

18 Civ. 488 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiff Adam Havens brings claims for disability discrimination, retaliation, and hostile work environment against Defendant The Hartford Financial Services Group ("HFSG"), pursuant to the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12102 et seq., the Family Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601 et seq., and the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law, art. 15. (See Am. Cmplt. (Dkt. No. 11))

        Defendant has moved to (1) compel Plaintiff to submit his claims to arbitration; and (2) dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(l) and the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (Def. Mot. (Dkt. No. 37)) For the reasons stated below, Defendant's motion to compel arbitration will be granted, and the Amended Complaint will be dismissed.

## BACKGROUND

I.   **THE ARBITRATION AGREEMENT**

The Complaint alleges that Plaintiff "was an employee of The Hartford for fifteen years, from 2001 through his termination in 2016, working in the underwriting division."[1] (Am. Cmplt. (Dkt. No. 11) ¶ 19)  On August 19, 2015, HFSG's Human Resources executive vice president and general counsel sent an email to Plaintiff and other employees who had not consented to arbitrate employment related disputes.  The email offered Plaintiff and his colleagues an additional day of Paid Time Off if – by September 30, 2015 – they consented to arbitrate employment-related disputes.  (Fazzino Aff. (Dkt. No. 40-1) ¶ 3 & Ex. C)

The email contained links to the company's "Arbitration Policy"; "Frequently Asked Questions" pages; and "Arbitration Policy Certification" – an electronic consent form. (Id., ¶ 3 & Exs. A, D, E).  Section II.A. of the Arbitration Policy states:  "This Policy requires both The Hartford and you to attempt to resolve employment related disputes through The Hartford's Employee Relations ("ER") Review Process (if you are still an active employee) and, where covered disputes remain, through final and binding arbitration."  (Id., Ex. A)  Section II.B. sets out the scope of the arbitration agreement, which expressly incorporates the ADA, FMLA, and "state or local anti-discrimination laws."  (Id.)  On August 24, 2015, Plaintiff accessed the electronic consent form and selected the option which reads, "Yes I have read, understand and agree to comply with the Arbitration Policy."  (Id., Ex. F)  Havens used his additional day of Paid Time Off in 2016. (Id. ¶ 6)

---

[1]  In the Amended Complaint, Plaintiff begins by asserting that "The Hartford Financial Services Group" does business as "The Hartford."  (Am. Cmplt. (Dkt. No. 11) ¶ 1)  He then refers to Defendant The Hartford Financial Services Group throughout as "The Hartford."  (Id.)  Plaintiff also asserts that he "was an employee of The Hartford for fifteen years, from 2001 through his termination in 2016."  (Id. ¶ 19)

## II. THE COMPLAINT'S ALLEGATIONS OF DISCRIMINATION

In 2014, Plaintiff was diagnosed with multiple sclerosis and informed his employer and superiors of his diagnosis. (Am. Cmplt. (Dkt. No. 11) ¶¶ 21-22) Due to his condition, plaintiff was absent from work on multiple occasions in 2014, 2015, and 2016. (Id. ¶¶ 24-26) Plaintiff's symptoms worsened in the summer of 2016, "and required him to take a leave of absence." (Id. ¶ 27)

"In mid-July, Mr. Havens' supervisor inquired as to when Mr. Havens expected to be able to return to work. Mr. Havens responded that he was not certain when he would be medically capable of returning to work, and that he required additional medical leave." (Id. ¶ 30)

"In a letter dated July 14, 2016 (the 'July 14 Letter'), Mr. Havens' supervisor told him that because he had used all of his available leave under The Hartford's leave policies, Mr. Havens lacked 'any source of job protection' to cover any absence from work after June 9, 2016. The July 14 Letter stated that because Mr. Havens was 'absent without job protection,' his 'employment with The Hartford is terminated effectively immediately.'" (Id. ¶ 32)

Plaintiff contends that he "requested from The Hartford leave as a reasonable accommodation for his disability," and that Defendant failed to (1) "provide a reasonable accommodation . . . [by] considering authorizing leave," and (2) "engage in an interactive process to determine the feasibility of providing [Plaintiff] with leave as a reasonable accommodation." (Id. ¶ 42-45) Plaintiff claims that he "was denied the ability to use the leave to which he was entitled under the FMLA," and that he "was terminated after trying to utilize the protections of the FMLA." (Id. ¶¶ 62-63)

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on March 17, 2017, and received a right-to-sue letter on December 15, 2017. (Am. Cmplt. (Dkt. No. 11) ¶ 35 & Ex. 1)

3

## III.   PROCEDURAL HISTORY

The Complaint was filed on January 19, 2018.  (Cmplt. (Dkt. No. 1)  The Amended Complaint was filed on February 15, 2018.  (Am. Cmplt. (Dkt. No. 11))  On May 9, 2019, Defendant moved to compel arbitration.  (Mot. (Dkt. No. 37))

## DISCUSSION

## I.   LEGAL STANDARD

Under the Federal Arbitration Act (the "FAA"), an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA provides that a party to an arbitration agreement may petition a district court for "an order directing that . . . arbitration proceed in the manner provided for in such an agreement."  9 U.S.C.§ 4.  The FAA was enacted to "revers[e] centuries of judicial hostility to arbitration agreements," Bird v. Shearson Lehman/ Am. Express, Inc., 926 F.2d 116, 119 (2d Cir. 1991) (internal quotation marks and citation omitted), and "embodies the national policy favoring arbitration . . . ."  Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006).

"In resolving a claim that an action must be arbitrated pursuant to an arbitration agreement, this Court must determine:  (1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration." Begonja v. Vornado Realty Tr., 159 F. Supp. 3d 402, 408-09 (S.D.N.Y. 2016) (citing Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008)).

When addressing a motion to compel arbitration, courts consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to

4

interrogatories, and admissions on file, together with [] affidavits," and "draw[] all reasonable inferences in favor of the non-moving party." Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks and citations omitted). "Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." Id. (internal quotation marks and citations omitted). Courts, not arbitrators, must decide whether parties have agreed to arbitrate "unless the parties clearly and unmistakably provide otherwise." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016).

## II. ANALYSIS

Defendant contends that Plaintiff "agreed, in exchange for an additional day of paid time off, to resolve 'employment-related disputes' through individual arbitration." (Def. Br. (Dkt. No. 37-2) at 7)[2] Plaintiff argues, inter alia, that (1) HFSG is a non-signatory to the arbitration agreement, and thus cannot seek to enforce the terms of the agreement as against Plaintiff; (2) the evidence before the Court is not sufficient to demonstrate his assent to the arbitration agreement, and (3) Defendant breached the arbitration agreement, and thus may not seek to enforce it. (Pltf. Opp. Br. (Dkt. No. 38))

### A. Enforcement of Arbitration Agreement by a Non-Signatory

Plaintiff contends that Defendant HFSG cannot seek to enforce the arbitration agreement against him, because it is not a signatory:

> HFSG has failed to adequately allege that it was a party to the purported arbitration agreement. The alleged contracting papers HFSG claims to have provided to Mr. Havens refer ambiguously to "The Hartford," but fail to define the purported contracting party. There are a multitude of "Hartford" entities, incorporated throughout this country and in countries all over the world, with varying names and corporate forms. HFSG cannot

---

[2] Unless otherwise indicated, all references to page numbers are as reflected in this District's Electronic Case Files ("ECF") system.

retroactively rewrite the alleged contract to apply to whichever entity proves convenient in a given case, and the Court should not countenance such an improper effort to do so.

(Pltf. Opp. Br. (Dkt. No. 38) at 6)

### 1. The Amended Complaint's Allegations Concerning Plaintiff's Employer

The arbitration-related documents at issue – including the Arbitration Policy; the Arbitration Process; the August 19, 2015 email inviting Plaintiff to consent to arbitration; Frequently Asked Questions; and the Arbitration Policy Certification, the electronic consent form – all refer exclusively to "The Hartford." (Fazzino Aff., Exs. A-F (Dkt. No. 40-1)) Plaintiff maintains that he was an employee of named defendant HFSG, and that HFSG "has not shown that [it] is a party to the purported arbitration agreement." (Pltf. Opp. Br. (Dkt. No. 38) at 9)

As discussed above, however, the Amended Complaint treats HFSG as synonymous with "The Hartford." (Am. Cmplt. (Dkt. No. 11)) Indeed, Plaintiff pleads that HFSG does business as "The Hartford," and further pleads that he "was an employee of The Hartford for fifteen years, from 2001 through his termination in 2016, working in the underwriting division." (Id. ¶¶ 1, 19) Accordingly, to the extent that Plaintiff argues that HFSG may not seek to enforce the arbitration agreement because that agreement is between Plaintiff and The Hartford, that notion directly contradicts the Amended Complaint's factual assertion that "The Hartford" and HFSG are synonymous.[3] In any event, as discussed below, HFSG need

---

[3] HFSG, for its part, claims that Plaintiff "was an employee of The Hartford Fire Insurance Company, [which] is a wholly owned subsidiary of [T]he Hartford Financial Services Group (HFSG)." HFSG states that it is a holding company that has no employees, and no corporate parent. (Def. Reply Br. (Dkt. No. 40) at 1 (citing Dkt. No. 17 (Corporate Disclosure Statement))

not be a signatory to the arbitration agreement in order to seek enforcement of its terms against Plaintiff.

2. **Applicable Law**

A non-signatory to an arbitration agreement may under certain circumstances "compel a signatory to that agreement to arbitrate a dispute." Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 127-28 (2d Cir. 2010). "Non-signatories seeking to compel a signatory to arbitrate a dispute find support in the Second Circuit in the principle of equitable estoppel, which requires a two-part inquiry." Alghanim v. Alghanim, 828 F.Supp.2d 636, 648 (S.D.N.Y. 2011). "First, 'a careful review of the relationship among the parties, the contracts they signed . . . , and the issues that had arisen among them [must] disclose[] that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" Id. (quoting Ragone, 595 F.3d at 127) (internal quotations omitted). Second, "'there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.'" Id. (quoting Sokol Holdings, Inc. v. BMB Munai, Inc., 542 F.3d 354, 359 (2d Cir. 2008)).

In the employment context, "[s]uch a relationship has been found where the non-signatory is a parent company . . . of a signatory . . . and the claims arose from the employment agreement containing an arbitration clause. . . ." Laumann v. Nat'l Hockey League, 989 F. Supp. 2d 329, 336 (S.D.N.Y. 2013) (citations omitted).

3. **Analysis**

Here, as to the first prong of the inquiry – "'intertwinedness'" – "the [amended] complaint does not materially distinguish between [the alleged] signatory [The Hartford] and [the alleged] non-signatory defendant[] [HFSG]." Alghanim, 828 F. Supp. 2d at 648. Indeed, as

discussed above, the Amended Complaint treats the signatory The Hartford as synonymous with the alleged non-signatory HFSG.  Moreover, the employment related disputes that are the subject of the Amended Complaint are clearly intertwined with the subject matter of the arbitration agreement that Plaintiff allegedly consented to.  See Alghanim, 828 F. Supp.2d at 648 (noting that first prong inquiry is "effectively the same question" as whether the claims involving the non-signatory "are within the scope of the [arbitration] [a]greement[]")

The Amended Complaint pleads employment discrimination claims under the ADA and the NYSHRL, as well as violations of the FMLA.  (Am. Cmplt. (Dkt. No. 11) ¶¶ 36-64).  Such claims are explicitly referenced in the arbitration agreement, which states that employees of The Hartford "are required to arbitrate any and all employment-related disputes, claims, or controversies . . . including but not limited to claims under . . . the Family and Medical Leave Act (FMLA); the Americans with Disabilities Act of 1990 (ADA); . . . [and] any state or local anti-discrimination laws. . . ."  (Fazzino Aff., Ex. B (Dkt. No. 40-1) at 13)

As to the second prong, the relationship between Plaintiff and HFSG also justifies the application of equitable estoppel.  Acknowledging that the parties dispute which entity employed Plaintiff – with Plaintiff maintaining that he was employed by HFSG, and HFSG asserting that Plaintiff was employed by an HFSG subsidiary, The Hartford Fire Insurance Company – it is undisputed that "The Hartford" is the party referenced in the arbitration agreement and the arbitration-related documents.  See Fazzino Aff., Exs. A-F (Dkt. No. 40-1) Although the Amended Complaint defines "The Hartford" as synonymous with HFSG (see Am. Cmplt. (Dkt. No. 11) ¶ 1), "The Hartford" is not defined in the arbitration agreement or in the other arbitration related documents.  See Fazzino Aff., Exs. A-F (Dkt. No. 40-1).

Whether Plaintiff was an employee of HFSG or its subsidiary The Hartford Fire Insurance Company, however, his employment – and the arbitration agreement he allegedly consented to – were under the rubric of "The Hartford." All of the documents he was sent concerning the Company's request that he consent to arbitrate employment-related disputes – the original email, the Arbitration Policy, the Frequently Asked Questions, and the Arbitration Policy Certification form – all reference "The Hartford." In exchange for providing his consent, he received a paid day off from HFSG. Given these circumstances, and the fact that the Amended Complaint pleads that HFSG is synonymous with "The Hartford," it is not plausible for Plaintiff to claim now that he did not realize that HFGS could seek to enforce the arbitration agreement against him. Acknowledging that HFGS is not the named party in the arbitration agreement and related documents, Ragone makes clear that a non-signatory can invoke an arbitration agreement in the context of an employment dispute where "it [was] plain that . . . [the employee] understood [the nonsignatory] to be, to a considerable extent, [his] co-employer." Ragone, 595 F.3d at 127 (emphasis added). In sum, any corporate affiliate of "The Hartford" – including HFSG, the entity he alleges is synonymous with "The Hartford" – is entitled, pursuant to equitable estoppel, to invoke the arbitration clause against Plaintiff as to employment-related disputes. See Laumann, 989 F.Supp.2d at 336 ("parent company, corporate successor, guarantor, or corporate affiliate of the signatory" may invoke arbitration agreement); see also Ross v. Am. Exp. Co., 547 F.3d 137, 144 (2d Cir. 2008) ("[T]his Court's cases which have applied estoppel against a party seeking to avoid arbitration have tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of corporate relationship to a signatory party . . . [such as] subsidiaries, affiliates, agents, and other related business entities.").

As both prongs of the two-part test are met here, Plaintiff may not resist arbitration on the ground that HFSG is a non-signatory to the arbitration agreement.

### B. Whether the Arbitration-Related Documents Are Properly Before the Court

Plaintiff contends that the arbitration-related documents submitted by HFSG have not been properly authenticated. (Pltf. Opp. Br. (Dkt. No. 38) at 7)

The documents at issue are attached to the May 6, 2019 affidavit of Maria Q. Fazzino. (Fazzino Aff. (Dkt. No. 40-1) Fazzino describes her background as follows:

> I am a Compliance Officer for the Hartford Fire Insurance Company ("The Hartford"). I have held that position since January 1, 2017. Previously, from April 1, 2013 to December 31, 2016, I was Assistant Vice President, Corporate Compliance. Prior to April 1, 2013, I was Director of Corporate Compliance. In each of these roles, I have been involved in planning and implementing The Hartford's policies and practices regarding employee arbitration agreements. I make this Affidavit freely, and based on my personal knowledge of the facts set forth herein. In addition, I have access to and have gathered all of the documents attached to this Affidavit.

(Id. ¶ 1) These representations are sufficient to demonstrate that Fazzino has personal knowledge of the documents at issue, and that they are what they purport to be.

Plaintiff also contends that certain aspects of the arbitration-related documents "raise[] questions about the accuracy of the documents provided." Plaintiff points out that Arbitration Policy Certification – the electronic consent form – "states that the employee should 'click the Continue button to go to the certification,' but the documents provided by HFSG do not contain a 'Continue' button and the purported certification appears below the aforementioned text." (Pltf. Opp. Br. (Dkt. No. 38) at 8) According to Plaintiff, the format of the documents "raises questions about the accuracy of the documents provided and, importantly, how the documents were oriented, formatted, and sized. . . ." (Id.) Plaintiff further contends that "the issue of notice depends heavily on the design and content of the webpage." (Id. (citing Nicosia, 834 F. 3d at 233 (2d Cir. 2016)

10

While it is true that no "Continue" button appears in the reproductions of the Arbitration Policy Certification attached to Fazzino's affidavit (see Fazzino Aff., Exs. E, F (Dkt. No. 40-1)), this fact is irrelevant.

After Plaintiff completed an electronic version of the consent form, he received a copy of the Arbitration Policy Certification reflecting the box he had checked off, which reads "Yes I have read, understand and agree to comply with the Arbitration Policy." (Id., Ex. F) The Certification reflects Plaintiff's name, his user name, and the submission date of his consent form – August 24, 2015. (Id.) The Certification also states: "The certification's start page, introduction, and questions appear below, along with the answers provided by Adam Havens. These items are presented as they appeared at the time the certification was submitted." (Id.) Plaintiff does not dispute that he checked off the box reading, "Yes I have read, understand and agree to comply with the Arbitration Policy." (Id.)

Plaintiff also does not dispute the authenticity of the email he received soliciting his consent to arbitrate employment-related disputes, or that the email contained a hyperlink to the Arbitration Policy Certification. (Fazzino Aff., Ex. C (Dkt. No. 40-1))

The Court concludes that Defendant has adequately demonstrated the authenticity of the arbitration-related documents attached to the Fazzino Affidavit.

### C. Manifestation of Consent

Plaintiff contends that he did not manifest consent to arbitrate employment-related disputes, because the contractual nature of the electronic consent form document was not obvious to him. (Pltf. Opp. Br. (Dkt. No. 38) at 12-17)

#### 1. Applicable Law

Arbitration is "a creature of contract," Starke v. SquareTrade, Inc., 913 F.3d 279, 288 (2d Cir. 2019), and accordingly "[s]tate law principles of contract formation govern the

11

arbitrability question." Nicosia, 834 F.3d at 231 (2d Cir. 2016). Here, the arbitration-related documents at issue do not contain a choice of law provision. HFSG asserts that New York law applies, because Plaintiff lived and worked in New York at the time the alleged agreement to arbitrate was formed. (Def. Br. (Dkt. No. 37-2) at 13 n. 6) Alternatively, HFSG posits that Connecticut law might govern, because HFSG's headquarters is located in that state. (Id.) HFGS further asserts that New York and Connecticut law are substantially similar as to the principles governing contract formation (id.), and Plaintiff does not dispute that proposition.

Second Circuit law indicates that contract formation principles under New York and Connecticut law bear substantial similarities. Compare Meyer v. Uber Technologies, Inc., 868 F.3d 66, 74 (2d Cir. 2017) ("New York and California apply substantially similar rules for determining whether parties have mutually assented to a contract term.") (internal quotation marks and citations omitted) with Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012) ("[B]oth Connecticut and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term.").

In light of the substantial similarity between New York and Connecticut law on the issue of contract formation, this Court "need [not] resolve this [] thorny choice-of-law question," Schnabel, 697 F.3d at 119, as "[w]hich state's law applies is [ultimately] without significance." Id.

Under New York law, "a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" Starke, 913 F.3d at 288-89 (quoting Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp., 93 N.Y.2d 584, 589 (1999)). "There is no carve-out to these principles for employment cases." Rightnour v. Tiffany & Co., 239 F. Supp. 3d 744, 752 (S.D.N.Y. 2017). "Where an offeree does not have actual notice of certain contract terms, he is

nevertheless bound by such terms if he is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." Starke, 913 F.3d at 289 (emphasis in original). In the web-based context, inquiry notice turns on whether "the design and content of the relevant interface" provided the arbitration provision "in a clear and conspicuous way." Starke, 913 F.3d at 289, 292; see also Edmundson v. City of Bridgeport Bd. of Educ., No. CV196083811S, 2019 WL 5066951, at *3 (Conn. Super. Ct. Sept. 18, 2019) (citing the analysis in Starke, 913 F.3d at 289 as "relevant and instructive"). "Thus, when terms are linked in obscure sections of a webpage that users are unlikely to see, courts will refuse to find constructive notice." Nicosia, 834 F.3d at 233.

### 2. Analysis

Here, Plaintiff interacted with two interfaces in connection with allegedly providing consent to arbitrating employment-related disputes: the August 19, 2015 email through which Plaintiff received the hyperlink to the Arbitration Policy Certification, and the Arbitration Policy Certification through which Plaintiff selected the box marked "yes." (Fazzino Aff., Exs. C, E, F (Dkt. No. 40-1)) Several features of the design and content of these two interfaces demonstrate that Plaintiff was, at a minimum, put on inquiry notice.

The email relates solely to the Arbitration Policy and has a description of "What is arbitration?" followed by links to the Arbitration Policy and Frequently Asked Questions. (Id., Ex. C) At the conclusion of the email, there is a clear presentation of what the employee is being asked and the implication of consenting: "After learning more about arbitration, decide whether to voluntarily consent or decline [hyperlink] to resolve disputes under our arbitration policy. By consenting, you're agreeing to pursue workplace disputes through arbitration rather than through an individual or class-action lawsuit." (Id.) The hyperlink included in this paragraph would have brought Plaintiff to the Arbitration Policy Certification. (Id. ¶ 3)

13

The Certification also contains a hyperlink to the terms of the putative agreement in a bolded sentence that reads "**Click <u>here</u> to read the Arbitration Policy and Process Documents.**" (Fazzino Aff., Ex. F (Dkt. No. 40-1) (emphasis in original)). Following the hyperlink is a sentence that states, "**If you have completed your review and understand the Arbitration Policy, click the Continue button to go to the certification. If you have any questions about the Policy or this Certification Process, please contact the HR Service Center.**" (Id.) (emphasis in original).[4]

Immediately after this statement, the following text appears.

I hereby certify that I have read and understand the Arbitration Policy and that final and binding arbitration is the exclusive forum for the resolution of disputes covered by the Policy.

**Click the Yes box** to certify that you have read, understand and agree to resolve covered disputes in accordance with the Arbitration Policy in exchange for eligibility for an additional day of PTO to be used during 2016.

"By clicking the "Yes" button below, I declare that I have read, understand and agree to comply with the Arbitration Policy. I further understand that by clicking the submit button below, I am electronically signing this Arbitration Policy Certification, and that my electronic signature has the same legally binding effect as my wet signature, as if I had physically signed this Arbitration Policy Certification in ink."

(Id.) (emphasis in original).

Plaintiff contends that his selection of the "yes" checkbox does not constitute consent to arbitrate employment-related disputes, citing the following language that appears next to the checkbox: "Yes I have read, understand and agree to comply with the Arbitration Policy." (Pltf. Opp. Br. (Dkt. No. 38) at 13-14; see Fazzino Aff., Ex. F (Dkt. No. 40-1). Plaintiff claims that this language creates ambiguity about whether he agreed "to opt into a binding arbitration agreement." (Id. at 13)

---

[4] The relevant portion of the page thus appears as follows:

Click <u>here</u> to read the Arbitration Policy and Process Documents

If you have completed your review and understand the Arbitration Policy, click the Continue button to go to the certification. If you have any questions about the Policy or this Certification Process, please contact the HR Service Center.

(Id.)

14

This is nonsense. The implications of checking off the box marked "Yes" were crystal clear, and Plaintiff's act of selecting the "Yes" checkbox is, "on its face[,] . . . reasonably susceptible of only one meaning." Selective Ins. Co. of America v. County of Rensselaer, 26 N.Y.3d 649, 655 (2016) (quotations omitted). Even if there were any ambiguity in this language – which there is not – the language next to the "No" checkbox – stating that the employee "does not wish to resolve covered disputes in accordance with the Arbitration Policy," see Fazzino Aff., Ex. F (Dkt. No. 40-1) – would have made clear the implications of answering "Yes."

In addition to the text next to "Yes" and "No" checkboxes, other language in the one-page Arbitration Policy Certification clearly explains what the company's arbitration program is, and asks the employee whether he or she wishes to "voluntarily elect to resolve covered disputes in accordance with the [Arbitration] Policy." (Id.) The consent form also informs the employee that, "[i]n exchange for your agreement to resolve covered disputes in accordance with the Arbitration Policy, you will be eligible for one (1) additional day of [Paid Time Off]." (Id.) Finally, the employee certifies, on the consent form, that the employee understands that he or she is agreeing to submit all work-related disputes to arbitration: "I hereby certify that I have read and understand the Arbitration Policy and that final and binding arbitration is the exclusive forum for the resolution of disputes covered by the Policy." (Id.) There is no ambiguity in the consent form.

Starke v. SquareTrade, Inc., 913 F.3d 279 (2d Cir. 2019), and Nicosia v. Amazon.com, Inc., 834 F.3d 220 (2d Cir. 2019), are not to the contrary. In both cases, the design of the interfaces directed attention away from the hyperlinked terms and conditions containing the arbitration provision. Starke, 913 F.3d at 293 ("the interface here is cluttered with diverse text, displayed in multiple colors, sizes and fonts, and features various buttons and

promotional advertisements that distract the reader from the relevant hyperlink."); Nicosia, 834 F.3d at 237 ("There are numerous other links on the webpage, in several different colors, fonts, and locations, which generally obscure the message."). Here, by contrast, the hyperlink to the Arbitration Policy was provided in multiple places such that a "user could not avoid noticing the hyperlink before [taking the assenting action]." See Starke, 913 F.3d at 294 (noting that in Meyer v. Uber Technologies, Inc., 868 F.3d 66, 78-80 (2d Cir. 2017), "significant weight" was placed on the fact that the terms of service could be reviewed before registration).

Moreover, unlike the post-sale email at issue in Starke, 913 F.3d at 292-95 – which contained a deluge of extraneous information – the email sent to Plaintiff had only one purpose: to solicit his agreement to arbitrate employment disputes in exchange for an additional day of Paid Time Off. (Fazzino Aff., Ex. C (Dkt. No. 40-1)). The first line of the email states: "You are receiving this email because you received an employment offer before March 7, 2012, or your first day of work was before April 1, 2012, and you can receive an extra day of PTO in 2016 by consenting to arbitration to resolve legal disputes." (Id.) Given the singular purpose of the email, the other explanatory material discussed above, and the fact that the email explains that, "[b]y consenting, you're agreeing to pursue workplace disputes through arbitration rather than through an individual or class-action lawsuit" (id.), Plaintiff's claim that he did not understand the contractual nature of the Arbitration Policy Certification is not plausible. (Id.)

Finally, the employment relationship between Plaintiff and HFSG does not change the analysis. As Judge Koeltl has noted, "[t]here is no carve-out to [the basic principles of offer and acceptance] for employment cases." Rightnour, 239 F. Supp. 3d at 752-53 (holding that there was no manifestation of assent to arbitration agreement where employee with pending claim of discrimination before the EEOC provided contemporaneous written rejection).

The Court concludes that Plaintiff had sufficient inquiry notice to manifest assent, and that he did in fact manifest assent.

D.      **Defendant's Alleged Breach**

Plaintiff argues, however, that Defendant's "own material breach of the terms of the [arbitration] policy render[s] any such agreement unenforceable against [Plaintiff]." (Pltf. Opp. Br. (Dkt. No. 38) at 17)  Plaintiff contends that Defendant breached the following provision:  "This Policy requires both The Hartford and you to attempt to resolve employment-related disputes through The Hartford's Employee Relations ('ER') Review Process (if you are still an active employee) and, where covered disputes remain, through final and binding arbitration." (Fazzino Aff., Ex. A (Dkt. No. 40-1) at 7)  Plaintiff argues that this provision requires that HFSG engage in the Employee Relations Review Process with Plaintiff before terminating his employment.  (Pltf. Opp. Br. (Dkt. No. 38) at 18)  This argument is not persuasive.

To the extent this provision imposes a condition precedent on HFSG, it is a condition precedent to commencing arbitration.  Nothing in the provision relates to the termination process.  Indeed, in including the language "if you are still an active employee," the provision clearly contemplates that the employee may have already been terminated.  This understanding is confirmed by other provisions in the Arbitration Policy.  For example, the Arbitration Policy states that "Employment with The Hartford remains 'at-will,' meaning that either you or The Hartford may terminate the employment relationship at any time for any lawful reason." (Fazzino Aff., Ex. A (Dkt. No. 40-1) at 7))  In sum, HFSG did not breach the

17

Arbitration Policy by terminating Plaintiff's employment prior to engaging in the Employee Relations Review Process.[5]

* * * *

The only remaining issue is whether the case will be dismissed or stayed pending arbitration. Defendant seeks dismissal. (Def. Br. (Dkt. No. 37-2) at 13 n. 5) "[B]ecause Defendant[] seek[s] dismissal rather than a stay . . . this Court has discretion whether to stay or dismiss Plaintiff['s] action under the FAA." Zambrano v. Strategic Delivery Sols., LLC, No. 15 Civ. 8410 (ER), 2016 WL 5339552, at *10 (S.D.N.Y. Sept. 22, 2016) (citing Katz v. Cellco P'ship, 794 F.3d 341, 347 (2d Cir. 2015) ("[A]bsent a statute or rule to the contrary, federal district courts possess the inherent power to stay pending litigation when the efficacious management of court dockets reasonably requires such intervention.")). Since the Arbitration Policy covers Plaintiff's entire claim, this Court finds that the case should be dismissed.

## CONCLUSION

For the reasons stated above, Defendant's motion to compel arbitration and motion to dismiss are granted. The Clerk of Court is directed to terminate the motion (Dkt. No. 37) and to close this case.

Dated: New York, New York
       March 13, 2020                                   SO ORDERED.

                                                                       _Paul Gardephe_
                                                                       Paul G. Gardephe
                                                                       United States District Judge

---

[5] In any event, "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." BG Grp., PLC v. Republic of Argentina, 572 U.S. 25, 34 (2014). Procedural preconditions include "'prerequisites such as . . . estoppel [] and other conditions precedent to an obligation to arbitrate. . . .'" Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 393 (2d Cir. 2011) (quoting Howsam v. Dean Witter Reynolds, 537 U.S. 79, 85 (2002)). Accordingly, any dispute about the provision in question would be resolved by the arbitrator.